## BAGLEY *v.* STATE

[No. 345, September Term, 1962.]

88

*Decided June 19, 1963.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*Fred Oken,* for appellant.

*Jacques E. Leeds, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General, William J. O'Donnell* and *Abraham L. Adler, State's Attorney* and *Assistant State's Attorney,* respectively, for Baltimore City, on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

The defendant, Nick D. Bagley, who was tried by a jury in the Criminal Court of Baltimore on an indictment charging him with robbery and murder, was convicted of murder in the first degree without capital punishment, and has appealed.

The victim, Donald J. Davis, operated a retail meat store on Falls Road in Baltimore City. Between 6:45 and 7:00 o'clock on the morning of November 28, 1961, the sales manager of a meat wholesaler answered his telephone and as he did he heard the storekeeper call his name and say "someone is knocking at the door" and "I think I have an early customer." After a pause of a few seconds, the storekeeper returned to the telephone and gave the sales manager his order and hung up without further comment. A few minutes after 7:00 o'clock a truck driver for another wholesaler, making a routine delivery, entered the store through the unlocked door and found the storekeeper lying in a pool of blood with a wound in his head. A revolver belonging to the storekeeper was on the floor close to and pointing toward the left side of his head. The storekeeper died four days later. At the hospital, particles of gunpowder were found in the wound canal. A note entered in the hospital record by the surgeon referred to the possibility of suicide and the medical examiner reported that the anatomical findings indicated a typical self-inflicted wound.

At the scene, besides the revolver, there was found a one-dollar bill, approximately $28 in change in a paper bag and $11 in change in a desk drawer. At the trial, an employee testified that the storekeeper had left $100 in the cash register the night before, but the wife of the deceased testified that he usually took money with him each morning for operating funds. His gold watch and wallet were found on the desk but there was no evidence that any money had been taken from the wallet. Other than a butcher knife, a cigar and some stamps on the floor and the telephone receiver dangling from the hook, there were no signs that a struggle had taken place.

About the middle of February of 1962, as a result of requested information received from the State Police of North Carolina, two members of the police department of Baltimore

City were sent to Durham to interrogate the defendant as a possible suspect in the death of the storekeeper. At this time the defendant was in the Durham jail awaiting a hearing on the charge of violating his probation on a charge of check raising. Several days before, the defendant on two occasions, in order to obtain food and lodging for a night, had told the police in Winston-Salem and Valdees that, while hitch-hiking near Washington (D. C.), he had had an altercation with a storekeeper and had killed him. It was the report of this fictitious killing on the teletype that caused the Baltimore police to inquire of the Durham police as to the whereabouts of the suspect.

The Durham police, at the request of the Baltimore police, talked to the defendant about the killing of the Baltimore storekeeper for the first time on February 12, 1962. They said that he told them he had been in Baltimore for several days shortly after Thanksgiving in 1961. When he was questioned again on the next day, the defendant said he had been involved in an accidental shooting of a Baltimore storekeeper following an incident involving the purchase of cigarettes and a subsequent altercation over the use of a telephone. On February 17, 1962, the defendant confessed the killing of Donald Davis in the presence of the Baltimore and Durham police and a stenographer and signed a statement to that effect. At the same time he signed a waiver of extradition and was subsequently brought back to Baltimore.

In substance, the signed confession stated that the defendant came by bus to Baltimore from Durham on November 26, 1961, and stayed at the home of a cousin. The next day he called a friend and arranged to meet him that night and go to a party. After getting "juiced up" on dope, he left the party alone about 4:30 o'clock in the morning of November 28. He walked until near daylight and came upon a group of stores, only one of which was lighted. The defendant knocked on the door, asked for cigarettes and was told that none was sold there. He then asked for some meat. After he was admitted, he decided to rob the storekeeper. He put his hand in a pocket of his green leather coat to pretend he had a gun and told the storekeeper that it was a "stick-up." The storekeeper picked up a butcher knife and the defendant knocked it out of his hand and again

demanded money. The storekeeper then retreated to the desk and came back with a revolver in his right hand. The defendant lunged at the storekeeper, grabbed his wrist and struggled with him. During the altercation there was a flash from the revolver and the storekeeper was shot in the left temple and slumped against the desk. The defendant took some money and ran. He returned to the home of his cousin and went to sleep. On the next day he returned to Durham. In the signed confession, the defendant also stated that he had told a girl friend in Durham that he had shot and robbed a man in Baltimore.

Approximately three hours after his return to Baltimore, the defendant, in handcuffs, was taken to the scene of the crime by the police. A photographer, a stenographer and an assistant prosecutor also accompanied the police. At the store, the defendant, orally and demonstratively, re-enacted the account of the holdup and shooting of the storekeeper he had given in the signed confession. By posing in and about the store both alone and in concert with the police detective acting the role of the victim, the defendant simulated the various phases of the holdup, resistance and shooting. Eight photographs of the posed scenes were taken. Seven of the photographs and the two confessions were admitted into evidence. At the trial, the defendant, claiming that he was not permitted to see a lawyer beforehand and that he had no choice but to participate in the re-enactment, denied its voluntary character, but the police (Lieutenant Glover, Sergeant Cadden and Detective Ray) testified that the defendant went to the scene and took part in the re-enactment willingly, and that no promises, threats or force had been used to induce his cooperation. The photographer did not testify as to the voluntariness of the re-enactment. Nor did the stenographer and assistant prosecutor take the stand. The defendant also claimed that he was instructed by the police where to stand and how to pose for the photographs.

The principal defense of the defendant was that he was in Durham when Davis was shot. His employer in Durham testified that the defendant had worked at his restaurant the entire week beginning November 27. He borrowed $20 from his employer on the evening of November 28—the day the storekeeper was shot. The loan was made by way of a check dated

that day. Another witness, whose endorsement was on the check, testified that she had cashed it for the defendant that same evening. The assistant manager of a clothing store in Durham identified the green leather coat as the one he had sold the defendant on December 30, 1961. The girl friend in Durham testified that the defendant had not told her that he had killed a man in Baltimore. The cousin of the defendant also denied that he had been in her home at any time in November of 1961. The defendant testified that in Durham he had been shown photographs of the scene of the crime and that they were the source of his information concerning the details of the crime. The Baltimore police admitted having photographs with them when the first confession was made but denied showing them to the defendant.

Three contentions are made on appeal: (i) that the re-enactment of the crime was an involuntary confession and was therefore inadmissible in evidence; (ii) that the photographs of the re-enactment were likewise inadmissible as evidence; and (iii) that it was error to refuse to instruct the jury that the State had the burden of excluding beyond a reasonable doubt every hypothesis that the death of the storekeeper was caused by means other than homicide.

(i)

Although the defendant contends that his signed confession was false, its admission as evidence is not challenged on appeal. It is the re-enactment, which reiterated and effectively corroborated the first confession, that is objected to as being involuntary.

Since the re-enactment was in fact a second confession, the question whether the evidence with respect to the re-enactment was admissible is governed by the same rules as govern the admission of confessions proper. "The burden is upon the State to show that the confession offered in evidence is the voluntary act of the accused, and not a product of force, threats, or inducement by way of promise or advantage." *Parker v. State,* 225 Md. 288, 291, 170 A. 2d 210 (1961); *Presley v. State,* 224 Md. 550, 168 A. 2d 510 (1961), *cert. den.* 368 U. S. 957 (1962); *Hall v. State,* 223 Md. 158, 162 A. 2d 751 (1960). In a case where the jury is the ultimate arbiter of the facts,

the matter of the admissibility of a confession involves, in the first instance, a question for the trial court to decide, but once it is admitted in evidence, the voluntary character of the confession becomes a question for the jury to decide in the light of all the facts and circumstances of the case. *Hall v. State, supra,* p. 169; *Linkins v. State,* 202 Md. 212, 96 A. 2d 246 (1953) ; *Smith v. State,* 189 Md. 596, 56 A. 2d 818 (1948).

Of course, the admissibility of a confession may be affected by the presence or absence of particular factors. However, the fact that an accused is under arrest and without counsel at the time a confession is made does not of itself constitute duress or necessarily make the confession inadmissible. *Hall v. State, supra,* p. 171. Nor is a confession rendered inadmissible merely because it was made while the accused was bound or handcuffed. *McCleary v. State,* 122 Md. 394, 89 Atl. 1100 (1914). And the fact that a confession has not been reduced to writing does not render it inadmissible. *Gault v. State,* 231 Md. 78, 188 A. 2d 539 (1963) ; *Williams v. State,* 231 Md. 83, 188 A. 2d 543 (1963).

Although it appears that the evidence produced at the trial was such as could persuade a jury to find beyond a reasonable doubt that the re-enactment of the crime was done freely and voluntarily, the defendant contends that the State was required to produce as witnesses all persons who were present at the re-enactment. At the trial the State called only the three police officers who had the defendant in charge to testify as to the voluntariness of the re-enactment. The photographer was not asked a question on this point, and neither the stenographer nor the assistant prosecutor was called to testify. It was said in *Jackson v. State,* 209 Md. 390, 121 A. 2d 242 (1956), that in practice the State *almost invariably* undertakes to prove the free and voluntary character of a confession by calling "all persons who had the prisoner in charge," [1] but that is not to say that the statement should be accepted as having established a

---

1. Since the only persons who actually had the "prisoner in charge" were the three police officers who were called to testify, it seems that in this case the State fully complied with the customary practice.

mandatory rule which *must* be followed in every case. While it may be that the State took an unnecessary risk of not meeting the burden required of it by not calling other available witnesses who were present at the re-enactment, we have found no case, nor were any cited, holding that all who witnessed the taking of a confession must testify as to its voluntary character. The contrary was held in *Glaros v. State,* 223 Md. 272, 279, 164 A. 2d 461 (1960). In *People v. Reader,* 186 N. E. 2d 298, 302 (Ill. 1962), it is said that "[t]o compel all police personnel who ever viewed the defendant while in custody to testify as to the voluntary nature of a confession is unreasonable and not required".

(ii)

The admission in evidence of the photographs of the re-enactment of the crime was likewise not improper.

In Scott, *Photographic Evidence,* § 692, it is said (at p. 653) that:

"Where the defendant himself goes to the scene of the crime and for the purpose of a photograph assumes the position he claims he was in at the time in controversy, the photograph is a pictured confession, and aside from the accuracy of the photograph it would seem that the only question concerning admissibility would be whether or not the defendant voluntarily permitted his picture to be taken; and this question is to be decided by the trial judge whose discretion in the matter will not be disturbed unless an abuse of discretion is shown."

The text is supported by *Viliborghi v. State,* 43 P. 2d 210 (Ariz. 1935); *People v. Dabb,* 197 P. 2d 1 (Cal. 1948); and *Kelley v. State,* 110 N. E. 2d 860 (Ind. 1953). The case of *Pollack v. State,* 253 N. W. 560 (Wis. 1934), is also in accord, but the Court did state that the practice was not to be commended. In Maryland, the admissibility of photographs, which are shown by competent extrinsic evidence to be true representations of what they purport to represent, is ordinarily within the sound discretion of the trial court. *Smith v. State,* 182 Md. 176, 32 A. 2d 863 (1943); *Wimpling v. State,* 171

Md. 362, 189 Atl. 248 (1937). Since there was evidence that the defendant voluntarily consented to the taking of the photographs, and there was no showing that the lower court abused its discretion, the admission of the photographs will be sustained.

The further contention of the defendant that the photographs were inadmissible because some of them depicted him in handcuffs is likewise without merit. It was not unreasonable, inasmuch as the defendant had confessed murder in the perpetration of robbery, to keep him handcuffed en route and while he was at the scene in order to forestall the possibility of escape. Nor is it likely, as an examination of the photographs shows, that the exhibition of them inflamed the jury or caused the defendant any undue prejudice. That he was handcuffed is not even apparent except in one of the photographs, and in that one the only part of the handcuffs which may be seen is not conspicuous. In *Mouton v. State,* 235 S. W. 2d 645 (Tex. Cr. App. 1950), where photographs of the defendant re-enacting the crime of murder were taken while he was in handcuffs, it was held that the admission of the photographs was not reversible error under the circumstances. In that case, even though no reason was seen for permitting introduction of the photographs other than to inflame the jury, they were not excluded because the Court was of the opinion that the photographs had been rendered inconsequential by the gruesome details of the crime related by the defendant in the written confession. In the instant case, where the inoffensive photographs were not calculated to prejudice the jury, we see no reason why they were not admissible to show that the defendant had actual knowledge of how the crime was committed and to corroborate the written confession he subsequently claimed he had fabricated.

(iii)

The trial court did not err in refusing to instruct the jury as requested by the defendant. The contention here is—since there were circumstances indicating that the death of the victim may have been suicidal—that the State had the burden of excluding every reasonable hypothesis except homicide. As is apparent, the requested instruction was not aimed at the guilt

or innocence of the defendant, but at the failure of the State to prove that the death of the storekeeper was not suicidal or accidental. This, as the defendant states, involves only the proof of the *corpus delicti*. The burden of establishing the "body of the crime" is, of course, on the State, and "where the circumstances point no more strongly to criminal homicide than to death by natural cause," it must be shown that death "did not result from accidental or natural causes, and was not suicidal." 3 Warren, *Homicide* (Perm. Ed.), § 270.

Maryland follows the rule that "[i]n a homicide case the proof of the *corpus delicti* is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which indicate that it was caused criminally by someone." *Jones v. State,* 188 Md. 263, 272, 52 A. 2d 484 (1947) ; *Pierce v. State,* 227 Md. 221, 175 A. 2d 743 (1961).

In this State an extrajudicial confession of guilt by a person accused of crime is not sufficient to warrant his conviction unless the State proves the *corpus delicti* by direct or circumstantial evidence independent of the confession. *Pierce v. State, supra,* p. 226. The "independent testimony necessary to establish the *corpus delicti* need not establish the fact beyond a reasonable doubt; but it is sufficient if, when considered in connection with the confession, it satisfies the trier of fact beyond a reasonable doubt that the offense was committed and that the defendant committed it." *Pierce v. State, supra,* p. 226; *Jones v. State, supra,* p. 271; *Foster v. State,* 230 Md. 256, 186 A. 2d 619 (1962). But it is not necessary to show by independent evidence that the confessor was the offender. *Weller v. State,* 150 Md. 278, 132 Atl. 624 (1926) ; *Foster v. State, supra.*

The lower court instructed the jury as follows :
"The jury is further instructed that the burden is on the State to prove beyond a reasonable doubt that the death of Donald J. Davis was a homicide. And if the jury is not convinced beyond a reasonable doubt in that regard, or if the jury believes that his death resulted from a self-inflicted wound, then the verdict of the jury should be not guilty."

The instruction correctly stated the law. The State had the burden of proving beyond a reasonable doubt that death was caused "criminally by someone," and the jury, in considering the independent evidence—to the effect that the storekeeper had an early customer who had knocked on the store door, that the door had been opened by the storekeeper, that a struggle had taken place behind the counter and that the storekeeper had been shot and robbed—together with the properly admitted confessions, found that the defendant was guilty of murder. So long as the State proved beyond a reasonable doubt, as it did in this case, that death resulted from the criminality of someone other than the deceased, this is all that the cases require.

Finding no error, the judgment will be affirmed.

At the conclusion of the oral argument, the attorney who represented the defendant below and on appeal informed the Court that while his client was indigent, he did not expect a counsel fee and had no intention of seeking one. We think he should be compensated for the legal services it is obvious he competently and conscientiously rendered the defendant on this appeal. Despite the disclaimer of a fee, we suggest the filing of a petition for the allowance of one.

*Judgment affirmed.*